**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE DEMOCRATIC PARTY OF WISCONSIN,
15 N. Pinckney St., Suite 200
Madison, WI 53703

and YEE LENG XIONG[1],

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
White House Office
1600 Pennsylvania Avenue, NW
Washington, DC 20500,

U.S. DEPARTMENT OF HOMELAND SECURITY,
Office of the General Counsel
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485,

MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485

U.S. CUSTOMS AND BORDER PROTECTION,
Office of Chief Counsel
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, DC 20229

RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, DC 20229

Case No. 26-3547

**COMPLAINT**

[1] Plaintiff's address not included in the caption is being filed under seal by notice pursuant to LCvR 5.1(c)(1).

U.S. OFFICE OF MANAGEMENT & BUDGET,
725 17th Street, NW
Washington, DC 20503;

and

RUSSELL T. VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget,
725 17th Street, NW
Washington, DC 20503

*Defendants*.

**INTRODUCTION**

**(Challenge to Defendants' unlawful funding of partisan political advertisements)**

1. Weeks before a midterm election that will largely serve as a referendum on the President's policies, the Trump Administration has turned the federal treasury into a campaign war chest. Over the past three weeks, the Administration has transferred millions of dollars of taxpayer funds to run thousands of illegal campaign ads that promote the Administration and attack the President's opponents—all aimed at improving the chances of Republican Party candidates in the upcoming election. To pay for this campaign, the Administration took money Congress appropriated for two very different purposes: securing the Nation's borders, and honoring Department of Homeland Security employees, including those who died in the line of duty.

2. Defendants' campaign strikes at the heart of our constitutional order. The Constitution forbids the government from tipping the electoral scales. By deliberately launching these illegal ads in contemplation of, and with a view towards influencing, the 2026 federal and state mid-term elections, Defendants have interfered with the electoral process, the sanctity of which is "of the most fundamental significance under our constitutional structure." *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 77 (2026) (quoting *Illinois State Bd. of Elections v. Socialist*

*Workers Party*, 440 U.S. 173, 184 (1979)).

3. Defendants' actions also flout various federal statutes. Every year—including this year, in legislation signed by President Trump—Congress has included the same restriction in its appropriations bill: "[n]o part of any appropriation . . . shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. E § 718, 140 Stat. 173, 495 (Feb. 3, 2026).

4. This legislation bans "purely partisan activities" and "self-aggrandizement." GAO, B-329373 (July 26, 2018). "Communications are considered purely partisan in nature if they were designed to aid a political candidate or party." *Id*. And they "are considered self-aggrandizement if the materials solely emphasize the importance of the agency or one of its officials." *Id*.

5. Defendants' ads fall squarely within this prohibition. They are "designed to aid" Republican candidates and the Republican Party, and to further the "aggrandizement" of President Trump.

6. Defendants' actions also violate numerous other federal statutes that govern Congressional appropriations and keep federal resources out of partisan politics. The Hatch Act Reform Amendments of 1993, 5 U.S.C. §§ 7321-26 ("Hatch Act"), prohibit political advocacy by government officials. The Purpose Statute, 31 U.S.C. § 1301(a), provides that federal funds can only be used for the purpose for which they were appropriated. The Antideficiency Act, 31 U.S.C. §§ 1341, 1517, prohibits agencies from spending federal funds that Congress has not appropriated. And 5 U.S.C. § 3107 prohibits use of appropriated funds to pay a publicity expert unless the funds are specifically appropriated for that purpose.

7. Defendants' actions thus defy a host of constitutional and statutory limits. Because

they put the government's thumb on the electoral scale, the actions violate the Constitution. Because they spend taxpayer funds on partisan campaign ads without legal authority and in violation of clear statutory limits, Defendants' actions independently violate the Administrative Procedure Act ("APA"). And because Defendants acted entirely in excess of their statutory authority, their conduct is also *ultra vires*.

8. It is particularly egregious that Defendants have funded their illegal propaganda campaign by converting funds Congress appropriated to keep the citizens of this country safe and to commemorate Department of Homeland Security ("DHS") employees, including those who have died in the line of duty.

9. Defendants' illegal misappropriation and misuse of taxpayer funds for partisan, self-aggrandizing, political propaganda purposes inflicts real harm—particularly on candidates for political office. The Supreme Court has held that candidates have a particular "interest in a fair [electoral] process," and that "[t]heir interest extends to the integrity of the election—and the democratic process by which they earn or lose the support of the people they seek to represent." *Bost,* 607 U.S. at 77, 82. Defendants' illegal propaganda campaign also works another concrete injury to Plaintiffs, since it requires them to expend more financial and other resources to counter Defendants' taxpayer-funded ads.

10. As a candidate and a party supporting candidates, Plaintiffs have standing to challenge Defendants' violations of federal law that undermine the fairness of the upcoming federal and state elections. Through this suit, Plaintiffs are also vindicating First Amendment and statutory rights to a fair electoral process and to be free from government propaganda paid for with their taxes.

11. "If there is any fixed star in our constitutional constellation, it is that no official,

high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Defendants have done just that. The Court should enjoin and vacate their unlawful actions and declare them unconstitutional, unlawful, and *ultra vires*.

**JURISDICTION & VENUE**

12. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

13. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because each Defendant is an agency of the United States or an officer of the United States sued in his official capacity. Venue is also proper in this district because a substantial part of the events giving rise to the claims occurred in this district.

**PARTIES**

14. Plaintiff Democratic Party of Wisconsin ("DPW") is the association representing Democratic voters in the State of Wisconsin. DPW is an affiliate of the Democratic National Committee. Its headquarters is located in Madison, Wisconsin, and it coordinates the work of county-level parties in all 72 counties in Wisconsin. DPW coordinates support among Wisconsin voters for Democratic candidates for statewide office and raises money to support those Democratic candidates. DPW and its members also support these candidates by organizing together and engaging in activities such as public education, door knocking, small-donor fundraising, and phone banking.

15. Plaintiff Yee Leng Xiong is a member of Democratic Party and is running for election as Wisconsin State Treasurer. His opponent is John Leiber, the incumbent and a member of the Republican Party.

16. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

17. Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.

18. Defendant Markwayne Mullin ("Mullin") is the Secretary of the United States Department of Homeland Security. He is sued in his official capacity.

19. Defendant United States Customs and Border Protection ("CBP") is a federal agency headquartered in Washington, D.C.

20. Defendant Rodney S. Scott ("Scott") is the Commissioner of CBP. He is sued in his official capacity.

21. Defendant United States Office of Management & Budget ("OMB") is a federal agency responsible for financial management policies for executive agencies. OMB is headquartered in Washington, D.C.

22. Defendant Russell T. Vought ("Vought") is the Director of OMB. He is sued in his official capacity.

## FACTS

### I. Taxpayer-Funded Advertisements

23. On September 23, 2026, about six weeks before the November 2026 general election, the Trump Administration began airing a series of political advertisements featuring President Trump, all paid for by the federal government. The ads have aired on broadcast, cable, and streaming platforms, including during Sunday political talk shows and college and professional football broadcasts.

24. The timing, content, and context of these ads demonstrate that they have no legal

non-electoral basis and were instead directed toward supporting the Republican Party and Republican candidates for partisan political offices in the upcoming election.

25. An ad titled "Love Me," aired on September 23, 2026, across the country on cable TV and connected TV. The ad says "Paid for by the U.S. Government." *See* https://www.youtube.com/watch?v=D1d0yMgw9yg.

26. The ad is a rapid montage of photographs and video of President Trump. Throughout, a song repeats the lyric "love me" in the background. In the ad, President Trump declares: "together we will defeat communism, socialism, and Marxism in America. America will never be a communist country." While he speaks, large red on-screen text proclaims: "LARGEST TAX CUTS IN HISTORY," "REIGNITING AMERICAN MANUFACTURING," and "DEFEND LAW AND ORDER AND POLICE." The advertisement closes with a clip from the Republican National Convention. In it, Ultimate Fighting Championship CEO Dana White calls President Trump "the toughest, most resilient person I've ever met."

27. The "Love Me" ad gives viewers no information about how to obtain any government benefit, service, or program. It is a tribute to President Trump personally. And its anti-communist message echoes the language President Trump has repeatedly used to vilify Democrats. *See, e.g.*, David Smith, *Trump attacks Democrats as 'godless communists' in test of midterms message*, The Guardian (June 26, 2026), https://www.theguardian.com/us-news/2026/jun/26/trump-democrats-communists-midterms?CMP=share_btn_url; Tim Balk, *Republicans, Facing Midterm Peril, Try to Brand Democrats as Communists*, New York Times (Sept. 12, 2026), https://www.nytimes.com/2026/09/12/us/politics/trump-democrats-communism-midterms.html?smid=url-share.

28. A second ad, titled, "Golden Age," features video of Trump speaking at Mount

Rushmore on July 3, 2026, and similarly says, "Paid for by the U.S. Government." *See* https://youtu.be/h7dSpiUz9zU?si=PyO_G3gV16uJAO7z. It aired on NBC's "Meet the Press," among other programs.

29. In the ad, President Trump says, "Never before has any nation celebrated so magnificent a triumph as this one." He adds that the United States is "the most successful, most accomplished, most exceptional nation ever to exist in human history." The ad ends with President Trump declaring, "This is only the beginning of the golden age of America."

30. Like the "Love Me" ad, the "Golden Age" ad conveys no information about a government program, service, benefit, or deadline. Its message is that President Trump and his Administration are responsible for a "golden age of America."

31. The third ad, titled "Final Battle," aired on the weekend of September 26, 2026, during Saturday Night Live, Fox News Sunday, and several college football and NFL games. https://www.youtube.com/watch?v=Yo4NUMQIJS8.

32. The ad shows President Trump walking down a hallway and staring into the camera. Over these images, he says: "This is the final battle. With you at my side, we will demolish the deep state." He goes on to vow to "expel the warmongers from our government," "drive out the globalists," "cast out the communists, Marxists, and fascists," and "throw off the sick political class that hates our country." The ad ends with him declaring: "We will rout the fake news media, and we will liberate America from these villains once and for all." A cheering crowd can be heard in the background.

33. The "Final Battle" ad is identical to a 2024 Trump campaign ad, except that the statement "Join President Trump's Fight for America" and the Trump campaign logo were cut from the 2024 version, and the statement "Paid for by the U.S. Government" was added.

34. Between September 23 and September 29, 2026, the Trump Administration used taxpayer dollars to air these ads at least 2,766 times, with the "Love Me" ad alone airing more than 1,300 times.

35. Public reporting indicates that President Trump personally instructed his budget director to use taxpayer money for the ads, "setting in motion a $20 million contract that used funds" from DHS, telling the director of the Office of Management and Budget "to come up with the money from within the government." Maggie Haberman et al., *Trump Directed Use of Taxpayer Money for Ads Praising His Presidency*, NY Times (Oct. 2, 2026), https://www.nytimes.com/2026/10/02/us/politics/trump-ads.html?smid=url-share.

36. On September 19, 2026, Administration officials moved $20 million into a CBP account intended for "commemorative events." *Id.*; Steven Portnoy et al., *Pro-Trump ad campaign was financed by DHS: Sources*, ABC News (Sept. 29, 2026), https://abcnews.com/Politics/pro-trump-ad-campaign-financed-dhs-sources/story?id=136861250.

37. CBP leadership was cut out of the decision to spend CBP funds for ads highlighting President Trump. Julia Ainsley, *CBP leaders cut out of Trump ad buy decision*, NBC News (Oct. 1, 2026), https://www.nbcnews.com/politics/immigration/cbp-leaders-cut-trump-ad-buy-decision-rcna600938.

38. On September 20, 2026, DHS awarded a $20 million contract to the LMD Agency, a Maryland-based advertising agency for a "National Media Campaign." *See* Contract Award to LMD Agency, Inc., U.S. Customs & Border Prot. ($20 million) (Sept. 20, 2026), USAspending.gov,https://www.usaspending.gov/award/CONT_AWD_70B06C26F00001137_7014_70Z02323ACGRC0001_7008.

39. Congress appropriated this money for "Line-of-Duty death memorials, Department

or agency anniversaries, and commendation ceremonies." Isaac Arnsdorf, *Campaign-style Trump ads use money meant for border security, memorials*, Washington Post (Oct. 1, 2026), https://wapo.st/4yqSpyn. The Trump Administration also used funds that were specified for "new inspection equipment for ports of entry; air and marine response capabilities; border surveillance upgrades; biometric technology; screening people crossing the border; screening unaccompanied children; and enhanced border security targeting drug trafficking." *Id*.

40. The ads do none of the things for which this money was appropriated. None of the ads have any relation to "Line-of-Duty death memorials," "Department or agency anniversaries," or "commendation ceremonies." Nor do any of the ads relate to enhancing border security.

41. None of the ads tell viewers how to enroll in, apply for, or obtain any government program, benefit, or service, or provide a deadline or other actionable public information. Instead, the ads glorify the President and are designed to aid the Republican party in the upcoming elections. Therefore, contrary to the Trump Administration's public assertions, these ads cannot be considered legitimate public service announcements for which appropriated funds may be permissibly used. *See* Press Release, The White House, Presidential Public Service Announcements Are Nothing New (Sep. 25, 2026), https://www.whitehouse.gov/releases/2026/09/presidential-public-service-announcements-are-nothing-new/.

42. The ads, moreover, largely repeat themes and slogans from the President's political campaigns. While President Trump is not formally on the November 2026 ballot, he has repeatedly urged voters to think of him as being on the ballot in the elections. *See, e.g.*, Kyla Guilfoil, *Trump tries new midterm message to supporters; 'Pretend, please, that I'm on the ballot,'* NBC News (Aug. 21, 2026), https://www.nbcnews.com/politics/2026-election/trump-tries-new-midterm-

message-pretend-i-am-on-the-ballot-rcna593849; Team Trump (@TeamTrump), X.com (Oct. 2, 2026), https://x.com/TeamTrump/status/2106176711440154864.

43. By glorifying and aggrandizing the incumbent President in elections that are largely a referendum on the President, and by attacking communists after repeatedly equating communists and Democrats, these ads serve as partisan propaganda promoting the Republican Party and Republican candidates in the upcoming election, injuring other candidates, including Plaintiffs.

44. By giving Plaintiffs' opponents an unfair and illegal advantage in a contested election, Defendants caused and will continue to cause injury to Plaintiffs. "[A]ny one competing for a governmental benefit may assert competitor standing when the Government takes a step that benefits his rival and therefore injures him." *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1299 (D.C. Cir. 2015) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (cleaned up)). "[A] plaintiff will likely suffer an injury-in-fact when the government acts in a way that . . . aids the plaintiff's competitors." *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008), *cited in Sherley*, 610 F.3d at 72.

45. Specifically in the electoral context, "[s]uch harm to candidates is in no sense 'common to all members of the public.' . . . . Voters, to be sure, also have a 'general interest' in an accurate vote tally. . . . But a candidate's interest differs in kind. An unfair and inaccurate election plainly affects those who compete for the support of the people in a different way than it affects the people who lend their support." *Bost*, 607 U.S. at 78. The "harm candidates suffer is distinct from that suffered by the 'people generally.' . . . Those who spend untold time and resources seeking to claim the right to voice the will of the people have 'an undeniably different—and more particularized—interest' in knowing [that will is free of unlawful influence.]" *Id.* "Candidates, in short, are not "mere bystanders" in their own elections. . . . They have an obvious personal stake

in how the result is determined and regarded." *Id*. at 78-79.

46. As a candidate in the upcoming election and an organization that supports such candidates, Plaintiffs have suffered harm because of Defendants' unlawful conduct.

47. On September 29, 2026, Defendants indicated that they plan to continue funding additional campaign ads using taxpayer money, causing further injury to Plaintiffs and other candidates for partisan offices. Alex Isenstadt, *Scoop: Trump's hand-picked, taxpayer-funded ads about to ramp up*, Axios (Sept. 29, 2026), https://www.axios.com/2026/09/29/trump-ads-taxpayer-funds.

48. On October 5, 2026, following backlash for the ads, President Trump announced that his super PAC, MAGA Inc., would pay for the ads moving forward. Shane Goldmacher & Maggie Haberman, *Trump Does Not Plan to Reimburse Taxpayers for Promotional Ads*, New York Times (Oct. 6, 2026), https://www.nytimes.com/2026/10/06/us/politics/trump-taxpayer-funded-ads.html?smid=url-share. However, White House officials announced that the super PAC would not reimburse the government for the more than $10 million that had already been spent on the ads. *Id*.

49. Despite the Administration's claims that President Trump's super PAC would pay for the ads moving forward, on October 6, 2026, a new taxpayer-funded ad began to air praising the Administration's success at removing former Venezuelan President Nicolás Maduro. *Id*.

50. Like the prior ads, this new ad displays the words "Paid for by the U.S. Government" at the end. AdImpact, Maduro (US Government) (creative alert) https://platform.adimpact.com/viewer/2df9dd4c-1220-485d-babe-f2594f18686c.

51. Like the prior ads, the Maduro ad does none of the things for which taxpayer funds were appropriated and cannot be considered a legitimate public service announcement for which

appropriated funds may be permissibly used. Instead, the ad glorifies the President and is designed to aid the Republican party in the upcoming elections.

52. On information and belief, other taxpayer-funded ads have continued to air after President Trump's October 5, 2026, announcement.

## II. Prohibitions on Partisan Political Activity by the Federal Government

53. Congress has established comprehensive limitations on the ability of executive officials to attempt to influence federal elections, including strict limitations on the use of official authority to engage in political activity and limits on the use of publicity and propaganda for self-aggrandizement and partisan purposes.

54. Various statutory provisions bar federal agencies and federal employees from engaging in partisan political activity or spending federal funds on partisan campaign advertisements.

55. The Hatch Act Reform Amendments of 1993 prohibit government officials from using their official positions to engage in partisan political activity and prevents most government officials from engaging in political activity while on duty, in uniform, or in a government building. 5 U.S.C. §§ 7321-26.

56. All federal employees, except the President and Vice President, are subject to the Hatch Act and are prohibited from using "official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1).

57. All federal employees, except the President, Vice President, and specific officers within the Executive Office of the President or who are Senate-confirmed Presidential appointees with duties that extend beyond normal duty hours and normal duty location are further prohibited from engaging in any political activity while on duty, in a government room or building, while

wearing any uniform or official insignia, or when using a vehicle owned or leased by the Government. 5 U.S.C. § 7324(a)-(b).

58. Separately, the Purpose Statute provides that federal funds "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

59. The Antideficiency Act prohibits agencies from spending federal funds in excess of an amount that Congress has appropriated. 31 U.S.C. §§ 1341, 1517.

60. Federal law also provides that appropriated funds may not be used to pay a publicity expert unless specifically appropriated for that purpose. 5 U.S.C. § 3107.

61. Section 718 of the Consolidated Appropriations Act of 2026 also prohibits the use of appropriated funds for "publicity or propaganda purposes" not authorized by the Congress. Pub. L. No. 119-75, div. E, § 718, 140 Stat. 173, 495 (Feb. 3, 2026). The prohibition exists to prevent "general propaganda effort[s] designed to aid a political party or candidates," and Congress enacted it to stop executive agencies from using taxpayer funds to direct public opinion. GAO March 2004 Decision, B-302504, at 8, 2004 WL 523435, at *7 (Mar. 10, 2004).

62. The Government Accountability Office ("GAO") has advised that this restriction prevents three separate forms of publicity and propaganda: self-aggrandizement, communications created for purely partisan purposes, and covert propaganda. *See* U.S. Gen. Accountability Office, Principles of Federal Appropriations Law 3-278 through 3-298 (4th ed. 2017).

63. The Office of Legal Counsel ("OLC") has recognized GAO's "self-aggrandizing" and "purely partisan" categories as "reasonable and valid interpretations" of section 718. *Expenditure of Appropriated Funds for Informational Video News Releases*, 28 Op. O.L.C. 109 (2004), https://www.justice.gov/file/145731-0/dl?inline. It has explained that Congress

enacted section 718 to eradicate agency efforts "to direct and control public thinking" through "overt political action" and agency "self-promotion, aggrandizement, or puffery." *Id.* Defendants' propaganda campaign thus violates longstanding policy that, consistent with these clear statutory prohibitions, bars funding political propaganda.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Violation of the First and Fifth Amendments Rights Against Unequal Electoral Subsidies)

64. The First Amendment "has its fullest and most urgent application" to speech during a campaign for political office. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). Under the First and Fifth Amendments, the government cannot favor some electoral candidates over others. *Id.*; *Buckley v. Valeo*, 424 U.S. 1, 93-94 (1976). Assistance to one competitor "is necessarily a relative burden on the other." *Greenberg v. Bolger*, 497 F. Supp. 756, 776–78 (E.D.N.Y. 1980). Government action that provides financial assistance to some parties or candidates in reaching voters, but not to others, therefore violates the Constitution. *Ariz. Free Enter. Club's Freedom Club PAC*, 564 U.S. at 742-43.

65. Candidates, moreover, "have an interest in a fair process." *Bost*, 607 U.S.at 77. Whether they "help, hurt, or have no effect on a candidate's electoral prospects," procedural departures can "deprive the candidate of a fair process and an accurate result." *Id.*

66. Defendants' actions occur in the context of an election and provide an electoral advantage to the President's party and its candidates. The economic value of the advertisements works as a campaign subsidy to Plaintiffs' opponents. Yet Defendants have given no comparable funding or advantage to Plaintiffs or to other parties and candidates.

67. By unlawfully using the resources of the federal government to purchase

advertisements promoting the incumbent President and his policies in an election that is largely a referendum on the President, the Defendants violated the First Amendment right of Plaintiff Xiong to run for political office in a fair election.

**COUNT TWO**

**(Violation of the First Amendment Discrimination Based on Party Affiliation and Other Protected Speech and Association)**

68. Candidates for elective office have a right not to be discriminated against in the election process based on party affiliation or other protected speech and association.

69. Using the resources of the federal government to purchase advertisements promoting the incumbent President and vilifying his opponents in an election that is largely a referendum on the President is a form of patronage that "can result in the entrenchment of one or a few parties to the exclusion of others" and thus violates the First Amendment. *Elrod v. Burns*, 427 U.S. 347, 369 (1976).

70. The government cannot require government employees to support or campaign for candidates from the Administration's favored political party or use public funds to support those candidates, and it similarly cannot use public funds to purchase ads supporting certain candidates for elected office.

71. The government causes cognizable injury to a candidate for elected office when it provides financial support to the candidate's opponents because that support provides "advantages for opponents in the competitive context of electoral politics." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736 (2011). Defendants' taxpayer-funded ads provide precisely such advantages to Plaintiffs' opponents, and it does so based on Plaintiffs' party affiliation and other protected speech and association.

72. "In the free society ordained by our Constitution it is not the government, but the

people individually as citizens and candidates and collectively as associations and political committees who must retain control over the quantity and range of debate on public issues in a political campaign." *Buckley v. Valeo*, 424 U.S. 1, 58 (1976). By using the overwhelming resources of the federal government to support candidates from the incumbent President's party, the Defendants violated that principle.

73. By using the resources of the federal government to purchase advertisements promoting the incumbent President in an election that is largely a referendum on the President, the Defendants discriminated against Plaintiffs based on their party affiliation in violation of the First Amendment.

74. By using the resources of the federal government to purchase advertisements promoting the incumbent President in an election that is largely a referendum on the President, the Defendants discriminated against Plaintiffs based on their speech and associations in violation of their rights to freedom of association.

**COUNT THREE**

**(Violation of the APA, 5 U.S.C. § 706(2), arbitrary and capricious, contrary to law, and in excess of statutory authority)**

75. The APA, 5 U.S.C. § 706(2), prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

76. Defendants' decision to expend funds and enter a contract for distribution of partisan campaign ads is a final agency action that is reviewable under the APA because it marks the consummation of the agency's decision-making process and is an action that determines rights

and obligations and from which legal consequences flow.

77. Defendants' actions are contrary to law and exceed the agencies' statutory authority. The decision to expend funds and enter a contract for distribution of partisan campaign ads violates longstanding federal law and policy prohibiting the expenditure of agency funds for partisan, publicity, and propaganda purposes.

78. Defendants' actions are also arbitrary and capricious. Defendants did not consider or explain how funds appropriated for line-of-duty memorials, commemorations, and border security could lawfully pay for partisan ads in the electoral context. Defendants bypassed CBP leadership and relied on a public justification—that the ads are public service announcements—that the ads' content contradicts. Defendants also acted on a misapprehension of the governing law, including section 718. And the Defendants departed without acknowledgment or explanation from GAO and OLC guidance regarding the use of agency funds for partisan or self-promotional communications.

79. The decision to expend funds and enter a contract for distribution of partisan campaign ads is also contrary to constitutional right because it infringes the First and Fifth Amendments' prohibitions against unequal government subsidy and discrimination on the basis of party affiliation.

80. The Court has authority under 5 U.S.C. § 706(2) to hold unlawful and set aside these agency actions as contrary to law, constitutional right, and exceeding the agencies' statutory authority.

## COUNT FOUR

**(*Ultra Vires*)**

81. Courts "ordinarily presume that congress intends the executive to obey its statutory

commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986).

82. The Supreme Court has affirmed "the long history of judicial review of illegal executive action, tracing back to England," and explained that the power of federal courts to "grant injunctive relief against … officers who are violating, or planning to violate, federal law" extends not only to state officials but also "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center, Inc*., 575 U.S. 320, 327 (2015).

83. Defendants do not have authority under the Constitution or federal statutes to take taxpayer funds appropriated by Congress for other purposes, and to pay for another unauthorized purpose. Their abuse of their office is compounded when the purpose for which they have used those funds is separately and specifically forbidden by federal law.

84. Defendants' funding of unauthorized publicity and partisan propaganda through the Trump ads exceeds their statutory authority and violates express statutory limitations in the Hatch Act, the Consolidated Appropriations Act of 2026, the Purpose Statute, the Antideficiency Act, and other statutory provisions.

85. Defendants' actions are *ultra vires* and must be enjoined, vacated, and set aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court assume jurisdiction over this matter and grant the following relief:

A. Issue a declaratory judgment that Defendants' funding of campaign ads is unconstitutional, contrary to the laws of the United States, and *ultra vires*;

B. Enter an injunction barring Defendants from funding any further campaign ads;

C. Hold unlawful, enjoin, vacate, and/or set aside the contract for distribution of these illegal campaign ads;

D. Require Defendants to repay the misappropriated taxpayer funds;

E. Award Plaintiffs reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable source of law; and,

F. Award any other such relief that this Court deems appropriate.

Respectfully submitted,

*<u>/s/ Norman Larry Eisen</u>*
Norman L. Eisen (D.C. Bar # 435051)
Stephen A. Jonas (D.C. Bar # 90037069)
Brian C. Ward* (D.C. Bar # 90046907)
Harold Craig Becker (D.C. Bar # 371239)
DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
norman@democracydefenders.org
steve@democracydefenders.org
craig@democracydefenders.org
brian@democracydefenders.org

John C. Quinn*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com

Dillon H. Grimm (D.C. Bar # 1719090)*
HECKER FINK LLP
1050 K Street, NW
10th Floor
(212) 763-0883
Washington, DC 20001
dgrimm@heckerfink.com

*Applications for admission *pro hac vice* forthcoming

*Counsel for Plaintiffs*